**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 96-4181

| | | |
|---|---|---|
| Steven Calvit, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Minnesota. |
| Minneapolis Public Schools; | * | |
| Four Winds School; Donna Grant, | * | |
| | * | |
| Defendants/Appellees. | * | |

_____

Submitted: June 12, 1997
Filed: August 18, 1997

_____

Before MURPHY, HEANEY, and NORRIS,[1] Circuit Judges.

MURPHY, Circuit Judge.

Stephen Calvit sued the Minneapolis Public Schools, the Four Winds School, and Donna Grant (collectively MPS) for retaliating against him for criticizing the school's policy for reporting child abuse. He alleged that MPS 1) violated his free speech rights under the United States and Minnesota constitutions; 2) violated the Minnesota whistleblower statute; 3) defamed him; and 4) illegally retaliated against him

_____

[1]The Honorable William A. Norris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

for reporting child abuse. The district court granted summary judgment in favor of MPS on the free speech and whistleblower claims and dismissed the other state claims without prejudice. Calvit appeals, and we reverse.

## I.

Calvit was a social worker at the Four Winds school, which is a magnet school emphasizing Native American culture. Under state law he was required to report child abuse within 24 hours of discovery. See Minn. Stat. Ann. § 626.556. Four Winds had developed its own policy on reporting child abuse, however, which allowed a report only if all members of a child abuse team determined one was necessary. According to Calvit, the policy violated state law and was designed specifically to limit reports involving Native American children. Calvit claims he often discussed his concerns about the school policy with his supervisors while he worked at Four Winds and also with a fellow social worker, Harold Lee. MPS claims on the other hand that he did not report his concerns over the policy until after his employment at the school ended.

Under his contract, Calvit would continue to work for the school district beyond the end of the school year unless the district terminated him before June 1. In May 1993, the school district decided to terminate his employment and sent a letter on May 12 informing him of its decision.

On May 12, Calvit reported to child protective services that he suspected that R.B., a student at Four Winds, might have been a victim of sexual abuse. Later that month, child protective services expressed its concern that Calvit's report had not been timely. Calvit claimed he followed school procedure and that initially he did not have enough information to conclude the child had been abused but that he reported it when he did. On June 3, Kay Bonczek, an administrator in the school district's human resources department, wrote Donna Grant, the principal of Four Winds, instructing her to investigate the report about R.B. and informing her that "[w]e will hold on Steve

-2-

Calvit's reappointment until the investigation has been completed and the situation is reviewed." A memorandum written in June indicated that Calvit called Bonczek on June 7 to sign a contract for the next school year but that he was told that the investigation had not been completed so his return to Four Winds would be delayed. Calvit's last day at Four Winds was June 14. On June 17, Grant informed Bonczek that she had investigated the matter, and determined that, among other things, when Calvit "interviewed [R.B.], he found no cause to believe abuse had occurred."

Four Winds had reviewed Calvit's general job performance on June 1 and rated him good or superior in every category. At the time Grant informed Bonczek about her investigation regarding the R.B. report, she described Calvit as "extremely conscientious" and said the school was "pleased with the work he had done. . . It is my request that he be reappointed as soon as possible." Later, on June 24, Grant wrote Bonczek that Calvit had done an excellent job and asked her to reassign him to Four Winds.

The first time Calvit made his views known to school district personnel outside of Four Winds was on June 24, 1993. On that day he met with the school district's supervisor of social workers, a special education administrator, and a human resources administrator and discussed Four Winds' child abuse policy. At this meeting Calvit stated that he had to get approval from Four Winds administrators before reporting child abuse and that Four Winds employees had tried to convince him not to report cases of suspected abuse. He claimed that he had been told to call a child's parents when the police came to take a child to a facility. He believed this was not proper. Calvit also indicated that there was a separate standard for reporting cases involving Native American children.

The school district rehired Calvit on August 12, 1993 and assigned him to the Morris Park Elementary School. One month later Calvit received a notice of deficiency from the human resources department for his action in the case involving R.B. The

notice stated that he had not reported a suspected case of child abuse in a timely manner and that his "conduct [was] unbecoming a teacher." The notice also stated that if he did not properly report child abuse his contract would be terminated. Despite the school district's criticism of Calvit's behavior, in 1994 the Minnesota Board of Social Work determined that Calvit was not at fault in his report regarding R.B. because there was no reason to believe abuse had occurred.

The school district's human resources department wrote to Calvit in November 1993 that "[t]he district has reassigned you to a full time social worker position at Morris Park to forestall any further complaint of Whistle Blowing." While at Morris Park he was assigned to be a transportation coordinator, in addition to his social work duties. The evidence is mixed on the quality of the assignment to Morris Park. The former principal of the school described its condition in 1993 as "stagnant, dysfunctional, and decaying [and] dirty, dark, devoid of any indications of student work or learning and very unhappy." On the other hand, Calvit's union representative urged him to take the job and Calvit said that he liked the first principal he worked with there, Harold Benson.

Calvit experienced problems at Morris Park. He testified that he informed the second principal, Nina Malm, about the disciplinary letter related to the R.B. case and his disagreement with its findings and conclusions. He also told a school administrator that he would report cases of child abuse if appropriate, even if he were told not to by the principal, and he testified that he told Malm that she was not following the standard child abuse reporting procedures. Calvit claims that other employees at Morris Park treated him rudely and the administrators did nothing to stop this. He also testified that Malm told him not to report certain child abuse cases. Calvit experienced health problems and left the school midway through the year.

Calvit sued MPS in state court for 1) violating his free speech rights under the first and fourteenth amendments to the United States Constitution and Article I, § 3 of

the Minnesota Constitution; 2) retaliating against him in violation of the Minnesota whistleblower statute; 3) defamation; and 4) retaliation for reporting suspected child abuse. The case was then removed to federal court.

The district court granted summary judgment in favor of MPS on the free speech and whistleblower claims and dismissed the other state claims without prejudice. The court reasoned that Calvit was not an employee at the time of his June 24 criticism of the child abuse policy and concluded that he could not show that he had been disciplined for his speech or that he was covered by the Minnesota whistleblower statute.

II.

On appeal Calvit argues that he had engaged in protected speech both before and after the school decided not to rehire him. He claims the decision not to rehire him, the assignment to an inferior school, and his constructive discharge were in response to his exercise of his constitutional rights. The whistleblower claim should not have been rejected because he reported illegal conduct when he worked both at Four Winds and at Morris Park and also on June 24, when he remained an employee or was covered as a former employee.

MPS contends that Calvit did not make any protected speech before the school district decided not to rehire him, that he was not an employee when he made his comments on June 24, and that no adverse action followed that speech. The school district in fact provided a benefit to Calvit by rehiring him. The court correctly ruled that the whistleblower claim was invalid because Calvit was not an employee at the time he reported Four Winds's child abuse policy, and even if he had been, he cannot point to any adverse action by the school because of those comments.

We review the grant of summary judgment de novo. Ringier Am., Inc. v. Land O Lakes, Inc., 106 F.3d 825, 827 (8th Cir. 1997). All evidence and reasonable inferences from the evidence are to be viewed in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment should not be granted if on the evidence a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## A.

In his claim brought under the first amendment, Calvit had the burden to demonstrate that he engaged in protected activity.[2] Hamer v. Brown, 831 F.2d 1398, 1401 (8th Cir. 1987). To be protected, the speech must be on a matter of public concern, and the employee's speech interest must not be outweighed by any injury to the government's interest in promoting the efficiency of its operation. See, e.g., Waters v. Churchill, 114 S. Ct. 1878, 1884 (1994). If the speech is protected, Calvit must

---

[2]Calvit also brought his free speech claim under Article I, § 3 of the Minnesota Constitution. In general the free speech protections provided by the Minnesota Constitution are no more extensive than under the United States Constitution. See State v. Davidson, 481 N.W.2d 51, 57 (Minn. 1992) (involving obscenity); State v. Century Camera, Inc., 309 N.W.2d 735, 738 n.6 (Minn. 1981) (involving commercial speech); Knudtson v. City of Coates, 519 N.W.2d 166, 171 (Minn. 1994) (Gardebring, J., dissenting) (Minnesota "generally look[s] to the federal constitution to define the parameters of the state free speech protections"); but cf. State v. Sports & Health Club, Inc., 370 N.W.2d 844, 873-74 (Minn. 1985) (Peterson, J., dissenting) (state constitutional protection may be broader). Since we conclude that Calvit has made a sufficient showing to withstand summary judgment under the United States Constitution, we need not determine whether the Minnesota Constitution would be more protective of his speech.

show it was a substantial or motivating factor in the action taken against him. Hamer, 831 F.2d at 1401. If Calvit meets this burden, MPS has the opportunity to demonstrate that the same action would have been taken but for the protected activity. Hamer, 831 F.2d at 1401.

MPS contends that Calvit's speech did not involve a matter of public concern and that he failed to show that the speech caused any detrimental employment action. Calvit's comments were not protected, MPS claims, because he did not make them publicly and he was motivated to make them not as a citizen arguing about the merits of public policy, but as an employee who wanted to deflect blame for delaying a child abuse report. MPS claims there is no evidence that Calvit had challenged the legality of the policy before the June 24 meeting, and the decision not to rehire him came before then. His subsequent rehiring provided him a benefit, negating any retaliation.

Whether speech is of public concern depends on the "content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). Speech that involves a matter of political, social or other concern to the community is of public concern. Shands v. City of Kennett, 993 F.2d 1337, 1343 (8th Cir. 1993). The form and context are examined to determine whether the public employee speaks as a concerned citizen informing the public that the government is not properly discharging its duties, or merely as an employee speaking about internal practices relevant only to fellow employees. Cox v. Dardanelle Pub. Sch. Dist., 790 F.2d 668, 672 (8th Cir. 1986).

Calvit's criticism of Four Winds' child abuse policy was on a matter of public concern, either if characterized simply as criticism of a child abuse policy or of a school policy based on race. Both the proper approach to the problem of child abuse and the merits of using racial classification in developing public policy are subjects in which citizens have a demonstrated interest. See Bowman v. Pulaski County Special Sch. Dist., 723 F.2d 640, 644 (8th Cir. 1983) (speech regarding proper care of children a

matter of public concern); Connick, 461 U.S. at 148 n.8 (racial discrimination is "a matter inherently of public concern"). Calvit need not have made comments to outsiders to be protected. The first amendment protects the speech of a government employee even when it is made privately to his employer. Connick, 461 U.S. at 146 (citing Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415 (1979)); Roberts v. Van Buren Pub. Schs., 773 F.2d 949, 955 (8th Cir. 1985).

There is evidence in the record that Calvit had spoken against the policy before his conduct was called into question. Calvit testified in his deposition that he had criticized the Four Winds policy as illegal before the school board decided in the spring of 1993 not to rehire him for Four Winds. Notes taken in the June 24 meeting by Dan Loewenson, a school administrator, indicated that Calvit said that "[a]ll year I was in conflict with [my supervisors] about reporting slowly for Indian comm[unity]." MPS's speculation about the motivation for Calvit's speech does not necessarily make it unprotected. In Connick, for example, a public employee criticized an office policy at the same time she was involved in a dispute over the application of that policy to her, yet the Court found some of the speech was a matter of public concern. 461 U.S. at 148-49.[3]

There is evidence creating a genuine issue of material fact whether Calvit's speech motivated MPS to take action against him and whether its action would have taken place but for his comments. Calvit had received a favorable performance evaluation for his work at Four Winds. The principal of the school praised his work and recommended that the school district rehire him. The assistant principal also

_____

[3]The Court in Connick did indicate that the context of the dispute was relevant in weighing the government's interest in the efficient discharge of official duties against the speaker's first amendment protections. 461 U.S. at 153. MPS has not argued in this case that Calvit's speech inhibited the discharge of official duties or even affected them, and the district court made no findings or conclusions about the relative balance of interests of Calvit and the defendants.

recommended that Calvit return to Four Winds. In light of his performance, an inference could reasonably be drawn that Calvit was not rehired because he had clashed with others at Four Winds over the child abuse policy.

Action taken in response to Calvit's speech of June 24 can be the basis for a first amendment claim even though he was not employed by the school district at the time. See Perry v. Sinderman, 408 U.S. 593, 596 (1972) (need not be an employee to be protected by the first and fourteenth amendments). Even if the school district did not have an obligation to reassign him to Four Winds, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech." Id. at 597. There is evidence that the school district denied him a fair opportunity to be reappointed to Four Winds because of his speech. The school district sent him a letter stating that he would not be reassigned to Four Winds in order to "forestall any complaint of Whistle Blowing." As further evidence of retaliation, Calvit indicated that although he was a social worker for the whole time he worked at Four Winds, he was assigned transportation duty for 30-40% of his time at Morris. Whether his assignment to Morris was retaliatory is a question of fact. Cf. Bowman, 723 F.2d at 645 (involuntary transfers can chill exercise of first amendment rights). Calvit has presented evidence that there were problems at Morris that made it an undesirable place to work. He has also presented evidence that the principal of Morris Park knew of his criticism of Four Winds and that he subsequently suffered verbal abuse and was constructively discharged.[4] Since there are genuine issues of material fact whether action taken against him was caused by

---

[4]There is also evidence of protected speech during the 1993-94 school year. Calvit testified that he told the principal at Morris Park, Nina Malm, that she had violated child abuse reporting procedures and that he had disagreements with her over not following state child abuse guidelines. In light of the short time between these statements and the negative treatment he alleges he received at Morris Park, a jury could conclude that he had been retaliated against for the exercise of his rights under the first amendment.

protected speech, summary judgment should not have been granted.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B.

The Minnesota whistleblower statute prohibits an employer from discharging, disciplining, threatening, otherwise discriminating against or penalizing an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee in good faith reported a violation or suspected violation of any state law to an employer or any governmental body.  Minn. Stat. Ann. § 181.932 (1993).

Minnesota follows the test set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), when analyzing a claim under the whistleblower statute.  The employee has the burden to establish a prima facie case; the employer must present a legitimate reason for its action; and the factfinder must decide whether the employer's reasons are pretextual.  Graham v. Special Sch. Dist. No. 1, 472 N.W.2d 114, 119 n.7 (Minn. 1991).  Summary judgment should be granted if there is no genuine issue of material fact on an element of the prima facie case.  A prima facie case requires the employee to show "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Rothmeier v. Investment Advisors, Inc., 556 N.W.2d 590, 592 (Minn. Ct. App. 1996).

Calvit claims the district court erred by granting summary judgment on the basis he was not an employee when he reported illegal activity.  He argues that he made reports while he worked at Four Winds during the 1992-93 school year and at Morris Park in 1993.  Apart from these reports, he contends he was in fact an employee on June 24 even though his contract had expired, but in any event former employees are covered by the whistleblower statute.  His statements, he contends, caused the school

-10-

district to decide not to reappoint him to Four Winds, to send him a disciplinary letter, to assign him to Morris Park, and to discharge him constructively.

MPS claims there is no evidence in the record that Calvit reported illegal activity while he was employed by the school district and he is therefore not protected by the whistleblower statute. It contends that the conversations cited on appeal, with Lee and the principal and assistant principal at Four Winds, were merely discussions with the employer and not protected conduct. Calvit's statement on June 24 is not protected because at that time he was not employed by the school district. Calvit was a nontenured probationary teacher under Minn. Stat. Ann. § 125.17, and once the school district informed him in May 1993 that he was not rehired for the coming school year, he had no right or expectation of employment with the district. Even if he had been an employee when he reported the illegal conduct, he can show no retaliation since he was provided a benefit by his rehire and any unfavorable treatment at Morris Park would be too remote to prove retaliation.

Calvit has presented evidence that he made statements while employed at Four Winds that the child abuse policy was illegal. There is evidence that he expressed concerns over the policy to Four Winds' principal and assistant principal and that he told another social worker at the school that the policy was illegal. His opposition to MPS' summary judgment motion mentioned that he had frequently collided with Four Winds administrators over its child abuse reporting, and the deposition testimony supporting this statement was in the record before the district court. There is also evidence that during the 1993-94 school year he reported to his principal at Morris that state law was violated regarding its child abuse policy. The Minnesota statute protects reports to "an employer or any governmental body," Minn. Stat. Ann. § 181.932 sub. 1(a), and a report to a coworker is sufficient to gain protection under the statute. Manteuffel v. City of North St. Paul, 538 N.W.2d 727, 728-29 (Minn. Ct. App. 1995) (involving a report of misconduct to a fellow employee).

-11-

Calvit has also presented evidence that MPS took adverse action against him in response to his protected conduct. The decision not to rehire him for Four Winds, to write a disciplinary letter, to assign him to Morris Park, and to place him on bus duty might reasonably be traced to his reports regarding Four Winds' child abuse policy and the administrators' allegedly illegal conduct there. Each of these actions followed his reports and each could be seen as a way to remove him from Four Winds and the school district. An inference could also be drawn that his difficulties at Morris Park and his alleged constructive discharge were caused by his reports. Although the alleged retaliation at Morris Park came some time after he reported wrongdoing at Four Winds, that fact does not necessarily entitle an employer to summary judgment as a matter of law. Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995); see also Tretter v. Liquipak Int'l, Inc., 356 N.W.2d 713, 715 (Minn. Ct. App. 1984) (involving retaliation six months after a complaint); Thompson v. Campbell, 845 F. Supp. 665, 675 (D. Minn. 1994) (involving a four month interval). There is also evidence that Calvit had reported wrongdoing at Morris Park and his problems there closely followed those reports. Since there is evidence from which a factfinder could determine that Calvit had reported violations of state law while he was under contract with the school district and that his reports caused the employer to take action against him, summary judgment should not have been granted in MPS's favor. See, e.g., Nichols v. Metropolitan Ctr. for Ind. Living, Inc., 50 F.3d 514, 516 (8th Cir. 1995) (summary judgment not appropriate under Minnesota whistleblower statute when employee has established a prima facie case of retaliatory discharge).

Calvit's June 24, 1993 statements about wrongdoing at Four Winds fall in a different category. Calvit was not an employee of the school district on that date under the terms of the statute governing his employment. Since he had had only two years of service with the school district when his contract at Four Winds was terminated, he was a probationary employee while there and the school district had no obligation to renew his contract. See Minn. Stat. Ann. § 125.17 sub. 2 (1994). Calvit has pointed to no Minnesota court that has interpreted the whistleblower statute to protect reports

of a former employee. Although the language of the statute resembles the anti-retaliation provision in Title VII which covers former employees, <u>Robinson v. Shell Oil Co.</u>, 117 S. Ct. 843, 849 (1997), we cannot say that the Minnesota statute should be extended to post-termination reports. <u>See</u> <u>Rothmeier</u>, 556 N.W.2d at 593.

## III.

Calvit has presented sufficient evidence to create genuine issues of material fact whether his rights under the first and fourteenth amendments were violated and whether he was entitled to protection under the Minnesota whistleblower statute. The judgment is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-