# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1566

_____

Nadine A. Hemminghaus

*Plaintiff - Appellant*

v.

State of Missouri; Gary M. Gaertner, Jr.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2014
Filed: July 1, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Nadine Hemminghaus worked as a court reporter for then Missouri circuit judge Gary M. Gaertner Jr. from October 2006 until April 2009. Hemminghaus complains Judge Gaertner fired her because she asked for leave from work to care for her children, whom she suspected had been abused by their nanny, and because she criticized the St. Louis Police Department and the county prosecutor for not pursuing

criminal charges against the nanny. Hemminghaus filed claims against the State of Missouri (the State) for violating § 102(a) of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2612(a), and against Judge Gaertner, pursuant to 42 U.S.C. § 1983, for retaliating against her for exercising her First Amendment right to free speech. The district court[1] granted summary judgment in favor of Judge Gaertner and the State on all claims. With appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A.    Facts[2]

Judge Gaertner was appointed as a Missouri circuit judge by the governor of Missouri in 2000, and successfully ran in retention elections in 2002 and 2008. In December 2009, Judge Gaertner was appointed to the Missouri Court of Appeals.

Before working for Judge Gaertner, Hemminghaus held two other court reporter positions for the State from May 1997 until October 2006. Judge Gaertner appointed Hemminghaus as his court reporter in October 2006, and she held that position until Judge Gaertner fired her on April 28, 2009. By statute, Hemminghaus was Judge Gaertner's "official court reporter" and held her "office during the pleasure of" Judge Gaertner. Mo. Rev. Stat. § 485.040.

---

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]We view the summary judgment facts in the light most favorable to Hemminghaus, the nonmoving party. See Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir. 2011) (FMLA); Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006) (retaliation).

In September 2008, approximately seven months before Hemminghaus was fired, she discovered her nanny had abused her two preschool-aged children. On many occasions thereafter, Hemminghaus asked Judge Gaertner for leave time to care for her children, who were having "emotional issues from the abuse." Judge Gaertner did not always allow Hemminghaus the requested leave time, and, when allowed, Hemminghaus had to find a substitute court reporter.

Hemminghaus sought criminal charges against the nanny, but the St. Louis county prosecutor declined to press charges. Hemminghaus considered speaking to the media about the case, but Judge Gaertner discouraged her from doing so by telling Hemminghaus she would be fired if she talked to the press. Hemminghaus did anonymously post "blog" messages on the Internet about her children's case and the issue of child abuse.

As Hemminghaus's children's behavioral problems escalated, she felt she needed more leave time to care for them, particularly in the mornings. Hemminghaus also felt she needed leave time to take the children to see their doctors and counselors for treatment and testing. According to Hemminghaus, Judge Gaertner sometimes did not answer Hemminghaus's requests for leave, causing her to miss doctor appointments.

Before her termination, Hemminghaus's relationship with Judge Gaertner became strained. On the day before her termination, April 27, 2009, Judge Gaertner denied leave to Hemminghaus to care for her children. As reported by Hemminghaus, during a conversation in chambers, Judge Gaertner told Hemminghaus not to mention the case against the nanny to anyone at the courthouse. Later that day, Judge Gaertner told Hemminghaus no one would take her case because no one would believe her children. Hemminghaus told Judge Gaertner, "[P]lease don't do anything to harm me or my case, and I won't have to tell people what you're doing to me by denying my rights." Hemminghaus wondered aloud if the investigative television

show *Dateline* would report on her case. Hemminghaus claims Judge Gaertner reacted by jumping up, running from behind his desk, and screaming, "Get out of here now and never come back in here again!" Hemminghaus told Judge Gaertner, "If you're going to fire me, just do it because I can't take this anymore."

The next day, Judge Gaertner called a meeting with Hemminghaus and Gail Crane, the Chief Probate Clerk. Suspecting she would be fired, Hemminghaus called her attorney and brought her cell phone with her attorney on the line into chambers. Because the attorney was on the phone, Judge Gaertner ended the meeting. He sent Hemminghaus a termination letter later that day.

## B. Procedural History

Hemminghaus filed a complaint in the district court alleging Judge Gaertner fired her for two reasons: first, because she asked for leave from work to care for her children, and second, because she criticized both the St. Louis county prosecutor for not pursuing criminal charges against the nanny and the police department for its handling of the case. Hemminghaus appeals the district court's grant of summary judgment to defendants on her claims for violation of the FMLA, alleged against the State, and of retaliation in violation of her First Amendment right to free speech, alleged against Judge Gaertner.

## II. DISCUSSION
### A. Standard of Review

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review a grant of summary judgment de novo." Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005).

**B.    FMLA Claim**

Hemminghaus contends Judge Gaertner violated the FMLA both by denying her leave to care for her children and terminating her for requesting such leave. The State argues Hemminghaus is not an eligible employee under the FMLA because she is excluded as a personal staff member of a public elective office holder. The FMLA excludes from its protection those employees who are "selected by the holder" of a "public elective office of that State" "to be a member of his personal staff." 29 U.S.C. § 203(e)(1), (2)(C)(ii)(I), (II); see 29 U.S.C. § 2611(3).

**1.    Public Elective Office Holder**

Certain state judges in Missouri, including Judge Gaertner, are selected according to the "Missouri Plan"—the governor first appoints them and they later can declare candidacy for a retention election without any opposing candidate. See Mo. Const. art. V, § 25(a), (c)(1). The first question here is whether such Missouri Plan judges "hold[] a public elective office." 29 U.S.C. § 203(e).

Our court has not directly answered this question. In 1984, we noted, but did not address, the issue in the context of Title VII of the Civil Rights Act of 1964: "Our holding that [an employee] was not an 'immediate adviser' makes it unnecessary to decide the further question whether Missouri Circuit Judges . . . are 'elected to public office' within the meaning of [42 U.S.C.] § 2000e(f)." Goodwin v. Cir. Ct. of St. Louis Cnty., Mo., 729 F.2d 541, 549 n.10 (8th Cir. 1984).[3]

_____

[3]Title VII excludes from the definition of "employee"

> any person elected to public office in any State . . . by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f).

In 1990, we discussed this issue in the context of an Age Discrimination in Employment Act (ADEA) claim.  See Gregory v. Ashcroft, 898 F.2d 598, 600 (8th Cir. 1990), aff'd, 501 U.S. 452 (1991).  The ADEA definition of "employee" excludes "any person elected to public office in any State . . . by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office."  29 U.S.C. § 630(f).  In determining whether Missouri state judges fell into this category, we reasoned,

> As a preliminary matter, we note that the District Court found [the Missouri state judges], initially appointed by the Governor and retained in office by a majority of the voters as required by the Missouri Plan, to be outside the ADEA's exception for persons "elected to public office".  Although we are inclined to disagree with this aspect of the District Court's decision, the Governor did not cross-appeal this issue, it was not briefed by either side, and it is not properly before us. We therefore express no opinion on this point, and shall assume for the balance of this opinion that state judges selected according to the Missouri Plan are appointed and not "elected" within the meaning of the ADEA.

Gregory, 898 F.2d at 600 (footnote omitted).  We held that "judges appointed under the Missouri Plan are excluded from the coverage of the ADEA because they are 'appointee[s] on the policymaking level' within the meaning of 29 U.S.C. § 630(f)."  Id. at 604.  The United States Supreme Court, too, did not reach the issue:  "Because we conclude that [the judges] fall presumptively under the policymaking-level exception, we need not answer this question."  Gregory, 501 U.S. at 467.[4]

---

[4]Although the Gregory inclination to disagree with the idea that Missouri state judges are *not* "elected to public office" is not binding on our panel, Gregory does have some persuasive value.  See Gregory, 898 F.2d at 600.  The ADEA exclusion language at issue there would have been even *more* difficult for a Missouri Plan judge to satisfy than the language at issue here, because it excluded "any person *elected to*

Nevertheless, we now decide the district court was correct in concluding Judge Gaertner was a public elective office holder. The FMLA language at issue excludes an employee who is a "*holder*" of a "public elective office." 29 U.S.C. § 203(e)(1), (2)(C)(ii)(I), (II) (emphasis added). Judge Gaertner had, in fact, been retained once in an election before hiring Hemminghaus as his official court reporter and twice before terminating Hemminghaus. The plain language of the statute makes no distinction between elective offices where another candidate's name appears on the ballot and offices where the holder is simply given an up or down retention vote. In either event, whether a "yes" or "no" retention of a sitting judge or a heated contest between multiple candidates, the process results in an "election," that is, a "choice," by the voting public.[5] "Retention elections are opportunities for the electorate to choose to retain a person as a judge. While a retention election does not place one person in electoral conflict with another, as in partisan elections, it is nonetheless an election. One serves at the will of the people in either event." African-Am. Voting Rights Legal Def. Fund, Inc. v. Missouri, 994 F. Supp. 1105, 1122 (E.D. Mo. 1997), aff'd per curiam, 133 F.3d 921 (8th Cir. 1998) (unpublished table decision). As the district court here aptly explained, "[v]ulnerability to ouster by the public is the very essence of an elective office." We agree with the district court that Judge Gaertner was a public elective office holder in the context of 29 U.S.C. § 203(e).

## 2. Personal Staff Member

The next question is whether Hemminghaus was "selected by" Judge Gaertner "to be a member of his personal staff." 29 U.S.C. § 203(e)(1), (2)(C)(ii)(II). If so, she is not an "employee" under the FMLA. See id. We have not previously

_____

public office in any State . . . by the qualified voters thereof," 29 U.S.C. § 630(f) (emphasis added), which arguably would not apply to a judge appointed by the governor who has yet to stand for election.

[5]Webster defines the verb "to elect" as "to make a selection of: choose." Webster's Third New International Dictionary 731 (1993).

construed the meaning of "personal staff" in the FMLA context. Because the "employee" definition is taken from the Fair Labor Standards Act (FLSA), the district court and the parties cite cases construing the definition of "personal staff" in the context of the FLSA, as well as Title VII.[6] In particular, the Fifth Circuit consolidated many circuits' cases (including Goodwin) to develop a set of non-exhaustive factors to aid in determining whether an employee is a member of the "personal staff."

> These factors include: (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

Teneyuca v. Bexar Cnty., 767 F.2d 148, 150-52 (5th Cir. 1985) (finding an assistant district attorney was a member of the "personal staff" of the elected district attorney).

---

[6]Judge Easterbrook of the Seventh Circuit described the interplay among many statutes interpreting the term "employee":

> The ADEA was interpolated into the [FLSA], and its definition of employee tracks the FLSA's. 29 U.S.C. § 203(e). It turns out to be a definition in wide use. Language essentially identical to the first clause of § 630(f) appears in [six other statutes, including the FMLA, 29 U.S.C. § 2611(3) (incorporating § 203(e)), and Title VII, 42 U.S.C. § 2000e(f)]. This means . . . that a definition may be secured from opinions that have addressed these other statutes.

E.E.O.C. v. Sidley Austin Brown & Wood, 315 F.3d 696, 708 (7th Cir. 2002) (Easterbrook, J., concurring).

See also Rutland v. Pepper, 404 F.3d 921, 922-24 (5th Cir. 2005) (per curiam) (applying the Teneyuca factors in the FMLA context and finding a deputy clerk was a member of the "personal staff" of the elected chancery clerk). We apply the Teneyuca factors to assist us here.

First, Judge Gaertner had plenary power to hire and fire Hemminghaus, as provided by Missouri statute: "each circuit judge shall appoint an official court reporter . . . . Such court reporter shall be a sworn officer of the court, and shall hold [her] office during the pleasure of the judge appointing [her]." Mo. Rev. Stat. § 485.040.

Second, "[t]he fact that state law permits" Judge Gaertner "to have this power shows that the state intends for the [court reporter] to be personally accountable to only one public official." Owens v. Rush, 654 F.2d 1370, 1376 (10th Cir. 1981). The fact Hemminghaus would transcribe testimony for requesting attorneys or would occasionally fill in for other court reporters does not materially alter this conclusion.

Third, while Hemminghaus did not answer the phones or speak for Judge Gaertner in his absence, she appeared publicly as part of his staff in an integral aspect of his judicial appointment: presiding in the courtroom. She was a "sworn officer of the court," Mo. Rev. Stat. § 485.040, whose duties, assigned by statute, were: "to attend the sessions of the court, under the direction of the judge thereof; [and] to take full stenographic notes . . . in every cause tried in said court." Mo. Rev. Stat. § 485.050. Sometimes, at trial, Judge Gaertner would introduce Hemminghaus by name to the public. Hemminghaus acknowledged that just as "it's important that people be able to trust the legal system and the judge to be impartial, . . . similarly, it's important for people to be able to trust the court reporter . . . [and] to believe that the court reporters are also impartial." Hemminghaus's own testimony demonstrates the court reporter has an important role in the eye of the public at court hearings and at trial, representing the judge and the legal system as a whole.

Fourth, Judge Gaertner exercised "a considerable amount of control" over the official court reporter position. As noted, he had complete authority to hire and fire his official court reporter. See Mo. Rev. Stat. § 485.040. Judge Gaertner also determined Hemminghaus's working hours. As Hemminghaus stated, "[Judge Gaertner] is my boss. He is the only one who could authorize my leave." Hemminghaus's work schedule depended upon when Judge Gaertner had events scheduled in court—for example, because he usually did not have events scheduled on Wednesdays, Hemminghaus frequently did not go to the courthouse on Wednesdays. On other days, Judge Gaertner sometimes allowed Hemminghaus to work from home and commonly allowed her to leave work before 5:00 p.m. Hemminghaus emphasizes the fact that she was an employee of the state, and Judge Gaertner did not set or pay her salary. Hemminghaus's argument in this regard "would effectively eradicate this entire category of exemption, since few elected officials' personal staff members are wholly administered and paid for personally." Bland v. New York, 263 F. Supp. 2d 526, 544 (E.D.N.Y. 2003).

Fifth, Hemminghaus reported directly to Judge Gaertner, without any intermediate supervisor in the chain of command. "[W]hen applying the fifth factor," we agree with the Fifth Circuit that the "personal staff exception . . . was primarily intended to exempt the elected official's *immediate subordinates* or those who are his first line advisors." Rutland, 404 F.3d at 924 n.3 (second alteration in original) (emphasis added) (quoting Montgomery v. Brookshire, 34 F.3d 291, 296 (5th Cir. 1994)).

The sixth factor, "the actual intimacy of the working relationship between the elected official and the person filling the position," Teneyuca, 767 F.2d at 151, is more difficult to evaluate. Presumably, during the time Hemminghaus was court reporting, she spent the day in close proximity with Judge Gaertner. But without testimony from Hemminghaus at the summary judgment stage recognizing such intimacy, it cannot be presumed here. Regardless, the majority of the Teneyuca

-10-

factors, and common sense, favor the conclusion that Hemminghaus was a member of Judge Gaertner's "personal staff."

To bolster her position to the contrary, Hemminghaus cites a U.S. Department of Labor (DOL) opinion stating official court reporters appointed by a judge do not fall into the personal staff exception. The DOL concluded:

> [C]ourt reporters do not fall under the personal staff exemption because they do not have the highly intimate and sensitive position of responsibility necessary to qualify for this exemption. They do not render advice or counsel to the judges or have any intimate or sensitive status vis a vis the judges. We also do not believe they represent the judges in the eyes of the public or are first line advisors. Thus, because court reporters do not have responsibilities of this nature, the personal staff exemption does not apply.

The district court rejected the DOL opinion, stating,"Th[e] author[] did not consider the facts of *this* case . . . . In light of my own interpretation of the case law, I do not find [the DOL reasoning] particularly helpful." We agree.

"Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant <u>Chevron</u>[7]-style deference." <u>Christensen v. Harris Cnty.</u>, 529 U.S. 576, 587 (2000). "Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'" <u>Id.</u> (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)) (finding the DOL's "interpretation of the statute at issue in this case" "unpersuasive").

---

[7]<u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).

The DOL opinion lacks persuasive force in light of the undisputed facts of this case. "Our inquiry into the nature and circumstances of the employment relationship between" Hemminghaus and Judge Gaertner "for the purpose of determining whether" Hemminghaus "is exempt from the protection of the" FMLA "is highly factual. It would not lend itself well to disposition by summary judgment were it not that most of the necessary facts are provided by statute or by" Hemminghaus's "testimony and summary judgment evidence." Gunaca v. Texas, 65 F.3d 467, 473 (5th Cir. 1995).

Viewing the facts as a whole, in the light most favorable to Hemminghaus, we conclude Hemminghaus was a member of the "personal staff" of Judge Gaertner, who held a "public elective office." 29 U.S.C. § 203(e)(2)(C)(ii)(I), (II). Therefore, Hemminghaus was not an eligible "employee" covered by the FMLA.[8]

## C.    First Amendment Retaliation Claim

Hemminghaus claims Judge Gaertner terminated her in retaliation for her speech, in violation of the protections afforded her by the First Amendment.[9] The district court determined Judge Gaertner was entitled to qualified immunity on Hemminghaus's First Amendment retaliation claim.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" Tolan v. Cotton, 572 U.S. ___, ___, 134 S. Ct. 1861,

---

[8]Because we find Hemminghaus is not an eligible employee under the FMLA, we do not reach the State's alternate argument that the "leeway" leave Hemminghaus requested is not covered by the FMLA.

[9]Judge Gaertner does not dispute the contention that Hemminghaus's speech was a motivating factor in her termination.

1865 (2014) (per curiam) (alterations in original) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." Tolan, 572 U.S. at ___, 134 S. Ct. at 1866 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As to the first prong, violation of a constitutional right, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Pickering v. Board of Education, 391 U.S. 563 (1968), "and the cases decided in its wake identify . . . inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418 (alteration in original). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id. "If the answer is yes, then the possibility of a First Amendment claim arises." Id.

Next, if the possibility of a First Amendment claim has arisen, "we must ask whether [the employer] has produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations." Lindsey v. City of Orrick, Mo., 491 F.3d 892, 900 (8th Cir. 2007). "Where there is no evidence of disruption, resort to the Pickering factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests." Belk v. City of Eldon, 228 F.3d 872, 881 (8th Cir. 2000).

Finally, if such an adverse impact is found, the court engages in the <u>Pickering</u> balancing inquiry: "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." <u>Garcetti</u>, 547 U.S. at 418. "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568. These questions "are matters of law for the court to resolve." <u>Kincade v. City of Blue Springs, Mo.</u>, 64 F.3d 389, 395 (8th Cir. 1995).

### 1.    Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983) (footnote omitted). "Speech that involves a matter of political, social or other concern to the community is of public concern." <u>Calvit v. Minneapolis Pub. Sch.</u>, 122 F.3d 1112, 1117 (8th Cir. 1997). "The form and context are examined to determine whether the public employee speaks as a concerned citizen informing the public that the government is not properly discharging its duties, or merely as an employee speaking about internal practices relevant only to fellow employees." <u>Id.</u>

In this case, Hemminghaus posted blog entries on the Internet about her case against her nanny. Most of the blog entries detail the particular personal issues facing Hemminghaus in her quest to see the nanny prosecuted. At least some of the blog posts express concern for the public at large and not just Hemminghaus's children, including the following: "I would call every daycare in the state if I thought I could do that legally." "We decided to do what we thought was the 'RIGHT THING' and try and protect others." "Please pay attention to who is up for re-election and do

research on them before you vote. . . . You[r] children have a voice in you when it comes to voting."

Hemminghaus told Judge Gaertner she wanted to speak publicly to expose the prosecutor's decision not to bring charges against her nanny. Hemminghaus wanted others to know of the danger the nanny ostensibly posed. Judge Gaertner apparently told Hemminghaus if she proceeded she would be fired. On April 27, 2009, Hemminghaus wondered aloud to Judge Gaertner if *Dateline* would be interested in her case against the nanny. Judge Gaertner allegedly responded by screaming at Hemminghaus to get out.

"[T]he proper approach to the problem of child abuse [is a] subject[] in which citizens have a demonstrated interest." Calvit, 122 F.3d at 1117. Although Hemminghaus's blog posts and other speech discussed her own case in detail, the district court correctly concluded Hemminghaus's "speech related to a matter of public concern," at least in part.

### 2. Adverse Effect on Courtroom Operations

Judge Gaertner "bears the burden under the Pickering balancing test of establishing permissible grounds" for Hemminghaus's discharge. Kincade, 64 F.3d at 397. But "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152 (footnote omitted). "[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." Waters v. Churchill, 511 U.S. 661, 673 (1994) (plurality opinion). "[W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." Id. "[I]n determining whether particular speech caused disruption in the workplace and therefore is not protected, we have

-15-

held '[e]vidence of actual disruption . . . is not required in all cases.'" Bailey, 451 F.3d at 521 (last two alterations in original) (quoting Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993)).[10]

"Pertinent considerations in the application of the Pickering test are whether the employee's speech has a detrimental impact on working relationships where personal loyalty or confidence is necessary, and whether the speech impedes the efficient operation of the governmental entity's function." Barnard v. Jackson Cnty., Mo., 43 F.3d 1218, 1224 (8th Cir. 1995). A judge has a particular responsibility to promote confidence in the judiciary. See Mo. Sup. Ct. R. 2-1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."). "Employee acts of insubordination may tip the balancing process in favor of the employer's interests in the efficient promotion of its services." Barnard, 43 F.3d at 1224.

"Although such evidence is not required, sufficient evidence of disruption exists in this case." Bailey, 451 F.3d at 521 (finding "sufficient evidence of *potential*

---

[10]But see Lindsey, 491 F.3d at 900 ("[A] public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships. Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." (internal citation omitted)); Belk, 228 F.3d at 882 ("Although we have held that public employers are not required to anticipate the outcome of the delicate Pickering balancing, that reasoning applies only to cases where the employer has made some showing of impediment to its efficient functioning. Where . . . the employer has failed to demonstrate any disruption, there is no balancing to be done and the evidentiary failure is fatal to the claim of qualified immunity." (internal citation omitted)). Supreme Court precedent, Waters, 511 U.S. at 673; Connick, 461 U.S. at 152, and our earlier precedent in Shands, 993 F.2d at 1344, place these cases in question.

workplace disruption" (emphasis added)). Here, the county prosecutor was a frequent party in Judge Gaertner's courtroom. Hemminghaus's repeated threats to speak with the media about the county prosecutor's alleged misdeeds (including on the day before her termination) could implicate "a judge's interest in avoiding the appearance of impropriety." McDaniel v. Woodard, 886 F.2d 311, 315 (11th Cir. 1989). While her blog posts were anonymous, Hemminghaus described her deteriorating relationship with the prosecutor's office: "Let's just tally all they've done to our family now: . . . Alienated the whole prosecuting attorney's office against me. Alienated the whole courthouse against me."

Finally, Hemminghaus's own interactions with the police department, as reported to Judge Gaertner by an assistant county prosecuting attorney, could create an appearance of impropriety—the county attorney reported that Hemminghaus went to the police department making demands and had to be escorted from the police department. The police department also chastised Hemminghaus for making harassing telephone calls to the nanny, who filed for a protection order against Hemminghaus. Hemminghaus does not deny these events occurred, stating, for example, that "the police had [] gotten [her] to agree not to call the nanny again," but emphasizes that these events occurred outside the workplace. Hemminghaus ignores the potential for an appearance of impropriety to arise when a "sworn officer of the court," Mo. Rev. Stat. § 485.040, engages in such conduct.

Hemminghaus's blog posts also describe workplace disruption. ("The job is practically emeshed [sic] in my personal life now as once I stated I'd go to the press unless I saw some action from someone to do something about her, they started to retaliate"; "I'm screwed as far as work. As for the job, I would leave it in a minute if I could"). By her own admission, the relationship between Hemminghaus and Judge Gaertner was strained. Hemminghaus reported she called a co-worker "to tell [the co-worker] it was just out of control with the judge." Hemminghaus also admits a co-worker disclosed that Hemminghaus made threatening comments about Judge

-17-

Gaertner.  Hemminghaus merely emphasizes the comments were not *physically* threatening.

Several of Hemminghaus's remarks or actions were clearly insubordinate: "[P]lease don't do anything to harm me or my case, and I won't have to tell people what you're doing to me by denying my rights"; "If you're going to fire me, just do it because I can't take this anymore."  Perhaps most serious, Hemminghaus brought a cell phone with her attorney on the line into chambers for a meeting with Judge Gaertner.

As in Bailey, where this court found adequate disruption when the employee and supervisor had an exchange that "became quite heated, with [the supervisor] eventually giving [the employee] an ultimatum to behave or be fired" and where the employee's speech "eventually led to another confrontation with [the supervisor] at a conference," Hemminghaus's actions are "sufficient evidence of disruption." Bailey, 451 F.3d at 521.[11]

### 3.     Pickering and Clearly Established Law

Under the Pickering test, a number of interrelated factors are taken into account in balancing the competing interests of government-employer and citizen-employee.  These factors include: (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and

---

[11]We also note the record indicates the majority of Hemminghaus's blog posts related to her personal dispute with the nanny and did not focus on child abuse as a public problem, lessening the burden on defendants.  See Connick, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."); Sexton v. Martin, 210 F.3d 905, 912 (8th Cir. 2000).

place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

Belk, 228 F.3d at 880-81. "At least five circuits have concluded that, because Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of . . . qualified immunity." Bartlett v. Fisher, 972 F.2d 911, 916 (8th Cir. 1992).[12]

The facts provided by Hemminghaus's record establish an admitted lack of harmony in chambers and a deterioration in the relationship between Judge Gaertner and Hemminghaus. The district court determined,

> [R]egardless of whether all of Hemminghaus' abundant speech was protected under Pickering, her right to engage in such speech was not clearly established at the time she was fired. Given her position as court reporter and the weight of [Judge] Gaertner's interest in impartiality and public confidence in the courts, it was reasonable for [Judge] Gaertner to be concerned about the potential conflict of interest that Hemminghaus' criticisms of the prosecutor may have created.

Hemminghaus argues the district court erred by emphasizing *potential* conflicts when "there is no evidence in this case that Hemminghaus compromised that integrity and impartiality by criticizing the prosecutor's office." Hemminghaus does not cite

---

[12]This is not to say Pickering balancing *never* allows for clearly established law in the qualified immunity analysis. See, e.g., Sexton, 210 F.3d at 914 ("[W]here the employees have spoken out on a matter of great public concern, and the evidence that the speech caused disruption in the workplace is minimal at best, the imprecision of the Pickering balance makes little difference in our determination. We conclude that at the time of the plaintiffs' termination, the law was clearly established that the balance would have weighed heavily in favor of the plaintiffs' exercise of free speech.").

clearly established law putting Judge Gaertner on notice that <u>Pickering</u> balancing in a situation such as this would fall in Hemminghaus's favor, nor have we identified any such case law.  Because Hemminghaus spoke mostly about her own private case, and disruption in the workplace was substantial and not "minimal at best," <u>Sexton</u>, 210 F.3d at 914, it was not "clearly established" that <u>Pickering</u> balancing would fall in Hemminghaus's favor.  Judge Gaertner did not have notice that his termination of an insubordinate employee who compromised the propriety and efficiency of his courtroom could violate her right to free speech.  The district court correctly determined Judge Gaertner was entitled to qualified immunity on Hemminghaus's § 1983 claim.

## III.  CONCLUSION

We affirm the judgment of the district court for the reasons stated in its well-reasoned opinion, as amplified here.

_____