# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1444
_____

United States of America

*Plaintiff - Appellee*

v.

Louis A. Rupp, II, individually and in his capacity as trustee for the Louis A. Rupp II Revocable Trust; Pauline Rupp, in her capacity as trustee for the Louis A. Rupp II Revocable Trust

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: January 12, 2023
Filed: May 19, 2023
_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.
_____

KELLY, Circuit Judge.

The United States brought an enforcement action under the Fair Housing Act (FHA) against Louis Rupp, a St. Louis landlord, alleging that Rupp unlawfully discriminated against renters based on their familial status. The district court granted summary judgment for the government, determining that Rupp violated the FHA.

The issue of damages, including punitive damages, was then submitted to a jury. Following a three-day trial, the jury awarded both compensatory and punitive damages. Rupp filed a post-trial motion to set aside or reduce the punitive damages award, which the district court denied.[1]  Rupp appeals the denial of his motion, and we affirm.

I.

Rupp has been a landlord in St. Louis, Missouri, since the 1970s.[2]  In 2016, Laura Erwin and Mack Teal sought to rent an apartment from Rupp to live in with their six-year-old son (collectively, the Erwin-Teals or the family). Because Erwin and Teal were not married at the time, Rupp required that they file separate rental applications. Both application forms stated that no children were permitted to reside in the apartment. Erwin and Teal told Rupp they had a son who would be living with them, and Rupp responded that he would allow them to rent on a "trial basis." Rupp gave Erwin and Teal a lease that contained a "no children" clause, but he included a handwritten amendment stating that the "lease contract is being entered on a trial basis in consideration of the 'no children' clause . . . ." Erwin and Teal signed their lease, which was to expire in one year. Later that year, Erwin became pregnant with her and Teal's second child.

After their lease ended in early 2017, Erwin and Teal continued to rent their apartment month-to-month. Then, in May 2017, Rupp sent Erwin and Teal a letter stating he wanted to renew their lease. Erwin and Teal agreed and signed a renewal contract. Erwin and Teal were relieved to renew the lease, as it gave them "peace of mind" to know they would have stable housing while caring for a newborn child.

---

[1]The Honorable Sarah E. Pitlyk, United States District Judge for the Eastern District of Missouri.

[2]"We recite the relevant facts in the light most favorable to the jury's verdict." Quigley v. Winter, 598 F.3d 938, 944 n.2 (8th Cir. 2010).

Erwin gave birth on May 25, 2017. It was a difficult birth, and Erwin underwent an emergency C-section surgery. She spent a few days recovering in the hospital and was in severe pain for at least a month afterward. She struggled with basic tasks like getting out of bed and climbing the steps of the apartment. Erwin planned to take two-and-a-half months off from work to recover and spend time with her newborn daughter.

But on June 12, just two weeks after Erwin gave birth, Rupp delivered an eviction letter to Erwin and Teal. The letter demanded that the family vacate the apartment no later than July 31, 2017, because the Erwin-Teals had violated the no children clause in the lease: their son lived in the apartment with them, and Erwin had "given birth to a girl who is also now living at the apartment."[3] The letter concluded, "In light of . . . your total disregard for the terms and conditions of your lease contract; we . . . [must] terminate your occupancy." It further warned the Erwin-Teals that their "failure to comply will result in legal action."

Erwin and Teal were distraught. They implored Rupp for "a little more time, some advance notice" to move out. Teal tried to reason with Rupp that it would be "inhumane" to put "a couple out in the street with a newborn baby." Rupp responded, "This conversation's not going to happen. You got to go." Erwin and Teal were "[c]ompletely blindsided" by the sudden eviction, and it was a "devastating" and "very physically demanding" task to move out by Rupp's deadline, especially while caring for a newborn and with Erwin still recovering from her surgery. They had trouble finding a suitable apartment by the move-out date, so they moved into Erwin's father's house, which was a challenging living situation for the Erwin-Teals. Because they needed a second income to pay for rental application fees and other expenses related to finding a new home, Erwin returned to work just five weeks after giving birth—over a month sooner than she had intended.

---

[3]The letter cited the Erwin-Teals' failure to pay a small fee as an additional reason for the eviction, but it emphasized that the two children were the primary reason for the eviction.

Ultimately, it took six months for Erwin to fully recover from her surgery, which she attributed to the fact that she did not have enough time to rest and heal.

The government filed suit against Rupp on behalf of the Erwin-Teals under the FHA, 42 U.S.C. §§ 3601 et seq.[4] Following discovery, the district court granted summary judgment for the government, determining that Rupp violated the FHA by terminating the Erwin-Teals' lease based on their familial status; imposing different lease conditions upon the Erwin-Teals based on their familial status; and using application and lease forms that expressed a preference based on familial status.[5] Id. § 3604(a), (b), (c). The case then proceeded to a jury trial on the issue of damages.[6]

The verdict form asked the jury to consider both compensatory damages and punitive damages for Erwin, Teal, their son, and their daughter. For compensatory damages, Erwin was awarded $9,400; Teal was awarded $3,000; and each child was awarded $1,000. For punitive damages, Erwin and Teal were each awarded $10,000, and each child was awarded $20,000. Therefore, in total, the jury awarded the family $14,400 in compensatory damages and $60,000 in punitive damages.

The district court then denied Rupp's post-trial motion to set aside or reduce the punitive damages award, in which he argued (1) that there was not a sufficient basis to submit punitive damages to the jury, see Fed. R. Civ. P. 50(b), and (2) that

---

[4]Erwin initially filed a complaint with the Missouri Commission on Human Rights, which was transferred to the U.S. Department of Housing and Urban Development (HUD). After investigating the complaint, HUD issued a "Charge of Discrimination." And pursuant to 42 U.S.C. § 3612(a), Rupp elected to have his charge heard in a federal civil action rather than before an administrative law judge.

[5]The FHA's definition of "familial status" includes when a child is "domiciled with . . . a parent." 42 U.S.C. § 3602(k)(1).

[6]Rupp's wife, Pauline Rupp, was also a defendant in the government's suit but is now deceased.

alternatively, the punitive damages award was excessive, see id. 59(e). Rupp appeals, and we address each argument in turn.

II.

Rupp first asserts that there was insufficient evidence to submit the issue of punitive damages to the jury. We review de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the verdict. See Morse v. S. Union Co., 174 F.3d 917, 922 (8th Cir. 1999); see also Sanders v. Lee Cnty. Sch. Dist. No. 1, 669 F.3d 888, 894 (8th Cir. 2012).

Victims of discriminatory housing practices can recover punitive damages under the FHA. Quigley, 598 F.3d at 952. Punitive damages are warranted "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 952–53 (quoting Badami v. Flood, 214 F.3d 994, 997 (8th Cir. 2000)). "Evil motive" or "reckless indifference" pertains to whether a defendant knows he "may be acting in violation of federal law," not his awareness that he is "engaging in discrimination." Badami, 214 F.3d at 994 (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999)). To be liable for punitive damages, "it is sufficient that a defendant discriminate in the face of a perceived risk that his actions will violate federal law." Quigley, 598 F.3d at 953 (cleaned up) (citation omitted).

Upon reviewing the record, we conclude there was sufficient evidence for a reasonable jury to find that Rupp acted with at least reckless indifference. See Badami, 214 F.3d at 998. Although Rupp asserted at trial that he was unaware discrimination based on familial status was unlawful when he evicted the Erwin-Teals, Rupp had 50 years of experience as a landlord. He testified that he managed "everything" as to the eight rental properties he owned, that he read the news "profusely," and that he researched tenants' rights issues. He had detailed knowledge of various laws and regulations governing his obligations as a landlord, and he was sophisticated enough to navigate eviction proceedings against tenants in

-5-

court without a lawyer. And when Rupp evicted the Erwin-Teals, he was aware that it was unlawful to discriminate against tenants on the basis of race, religion, and disability. Notably, the disability basis was added to the FHA in 1988—at the same time the familial status basis was added to the Act. See Act of Sept. 13, 1988, Pub. L. No. 100-430, 102 Stat. 1619. A reasonable jury could conclude that if Rupp was aware of the contemporaneously added disability basis, he must have known about, or was recklessly indifferent to, the familial status basis as well.

Despite his extensive experience and knowledge as a landlord, Rupp proceeded to evict the family shortly after learning Erwin gave birth to a second child. The evidence was sufficient to support the conclusion that Rupp, at the very least, acted recklessly and discriminated against the Erwin-Teals "in the face of a perceived risk" that his actions would "violate federal law." Quigley, 598 F.3d at 953 (citation omitted). Indeed, the government presented evidence that Rupp continued to use his unlawful lease forms even *after* the Erwin-Teals filed their complaint, which had put Rupp on notice that the FHA prohibits familial-status discrimination. The district court did not err by submitting punitive damages for the jury's consideration.

III.

Rupp next argues that the punitive damages award is unconstitutionally excessive, which is an issue we review de novo. Masters v. City of Independence, 998 F.3d 827, 840 (8th Cir. 2021). A jury has "considerable flexibility in determining the level of punitive damages." Ondrisek v. Hoffman, 698 F.3d 1020, 1028 (8th Cir. 2012). The purpose of punitive damages is "to further legitimate interests in 'punishing unlawful conduct and deterring its repetition.'" Masters, 998 F.3d at 840 (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996)). However, a punitive damages award that is "grossly excessive" in relation to those legitimate interests violates the Due Process Clause of the Fourteenth Amendment. Id. Punitive damages are grossly excessive if they "shock the conscience of this court or demonstrate passion or prejudice on the part of the trier of fact." Trickey v.

-6-

Kaman Indus. Techs. Corp., 705 F.3d 788, 802 (8th Cir. 2013) (cleaned up) (quoting Ondrisek, 698 F.3d at 1028).

To assess whether a punitive damages award is grossly excessive, we consider "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between punitive damages and actual harm (compensatory damages), and (3) the civil or criminal penalties that could be imposed for comparable misconduct." Quigley, 598 F.3d at 953 (cleaned up and citation omitted). Having considered each factor, we conclude that the punitive damages award here is not unconstitutional.

First, the degree of reprehensibility weighs heavily in favor of affirming the punitive damages award. See Quigley, 598 F.3d at 954 (explaining that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" (quoting Gore, 517 U.S. at 575)). In assessing reprehensibility, we consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)). Looking to these considerations, we agree with the district court that Rupp's conduct was reprehensible. Erwin and Teal both testified about the significant emotional distress, a noneconomic harm, that they endured because of Rupp's actions. See Moore v. Am. Fam. Mut. Ins. Co., 576 F.3d 781, 790 (8th Cir. 2009) (concluding that the type of harm suffered by the plaintiffs, which included emotional distress, was "not limited to financial losses" and therefore supported the determination that the defendant's conduct was reprehensible). And after Erwin received the eviction notice from Rupp two weeks after giving birth, her recovery from surgery was hindered, as she was forced to move out of the apartment and return to work.

Further, the abruptness of the eviction—despite the family's plea to be given more time to find new housing—evinced indifference to or reckless disregard of the Erwin-Teals' health and safety. There was also evidence that the family was financially vulnerable—a factor that Rupp has conceded weighs against him. Moreover, Rupp used the unlawful lease forms barring children from his properties for decades, and did so again even after the Erwin-Teals' discrimination complaint put him on notice that familial-status discrimination is unlawful.

Second, the ratio between punitive and compensatory damages also suggests the punitive award is not grossly excessive. Punitive damages "must bear a reasonable relationship to compensatory damages," Quigley, 598 F.3d at 954 (cleaned up), but there are "no rigid benchmarks" for assessing the reasonableness of the award. Campbell, 538 U.S. at 425; see also Masters, 998 F.3d at 841 ("The Supreme Court has consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, although it has also suggested that few awards exceeding a single-digit ratio . . . will satisfy due process." (cleaned up and citation omitted)). "A high ratio may be appropriate based on particularly reprehensible conduct . . . ." Wallace v. DTG Operations, Inc., 563 F.3d 357, 362 (8th Cir. 2009).

In total, the jury awarded the family $60,000 in punitive damages and $14,400 in compensatory damages—a roughly 4:1 ratio. But Rupp argues that we should assess the damages in the disaggregate, or in other words, by calculating the ratio of damages awarded to each individual family member rather than to the family collectively. In particular, Rupp focuses on the damages awarded to each child: $20,000 in punitive damages and $1,000 in compensatory damages—a 20:1 ratio.

We conclude that under our precedent the punitive damages award, whether assessed in the aggregate or disaggregate, bears a reasonable relationship to the compensatory damages award in light of the reprehensibility of Rupp's conduct. See Wallace, 563 F.3d at 363; see also United States v. Big D Enters., Inc., 184 F.3d 924, 933 (8th Cir. 1999) ("In cases where the other factors [like reprehensibility] are

-8-

strong, a 526 to 1 ratio may be appropriate."). In addition, because the children were so young at the time of the eviction, the jury may have found it difficult to ascertain the monetary value of their noneconomic harm, such as emotional damage. See Quigley, 598 F.3d at 954 (explaining that high ratios are permissible where "the monetary value of noneconomic harm might have been difficult to determine" (quoting Gore, 517 U.S. at 582)).

Third, the "civil penalties authorized or imposed in comparable cases," Campbell, 538 U.S. at 418, suggest that the punitive damages award of $60,000 here is not grossly excessive. See Big D Enters., 184 F.3d at 933 (pointing to the FHA provision that allows courts to impose a fine and concluding that "[t]he fact that the FHA permits courts to impose a fine . . . *in addition to* compensatory and punitive damages significantly undercuts appellants' argument that the punitive damage award [of $50,000] in this case is excessive"); 42 U.S.C. § 3614(d)(1)(C)(i) (allowing courts to impose a fine of up to $75,000, as adjusted for inflation by 28 C.F.R. § 85.3(b)(3)(i)).

In sum, the relevant indicia support the conclusion that the jury's punitive damages award is not grossly excessive. The award "comports with due process, while achieving the statutory and regulatory goals of retribution and deterrence." Quigley, 598 F.3d at 956.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

STRAS, Circuit Judge, concurring.

The court's opinion is a faithful application of existing precedent. *See, e.g.*, *Quigley v. Winter*, 598 F.3d 938, 952–56 (8th Cir. 2010). I write only to question, once again, why we are engaging in this exercise at all. *See Adeli v. Silverstar Auto., Inc.*, 960 F.3d 452, 464–65 (8th Cir. 2020) (Stras, J., concurring) (describing the

-9-

reduction of punitive-damages awards as "judicial alchemy" that finds no support in historical practice); *see also Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 39 (1991) (Scalia, J., concurring in the judgment) (explaining that it is "not the role of the Due Process Clause" to reduce or eliminate punitive damages).  Rescuing Fair Housing Act "defendants from *bad outcomes* that arise out of perfectly *good procedures*" falls within Congress's domain, not ours.  *Adeli*, 960 F.3d at 464, 465 n.8 (Stras, J., concurring) (explaining why); *see* 42 U.S.C. § 3613(c)(1) (expressly authorizing the "award" of "punitive damages" in the first place).

_____