# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-2555

_____

Tad Mayfield

*Plaintiff - Appellee*

v.

Missouri House of Representatives; Elijah J.L. Haahr

*Defendant*s

Dana Rademan Miller

*Defendant - Appellant*

Judy Kempker

*Defendant*

Emily White

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: May 7, 2024
Filed: December 13, 2024

_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

On August 3, 2020, while employed in the assistant clerk's office of the Missouri House of Representatives (the House), Tad Mayfield emailed the Speaker of the House and the President Pro Tem of the Missouri Senate advocating for the use of masks in the state capitol building. On August 6, 2020, Mayfield was fired. Thereafter, Mayfield brought this 42 U.S.C. § 1983 action against defendants,[1] the chief clerk and assistant chief clerk of the House, alleging wrongful termination in retaliation for sending the August 3 email. See U.S. Const. amend. I; 42 U.S.C. § 1983. After a two-day trial, a jury found in Mayfield's favor. The district court[2] denied defendants' motions for judgment as a matter of law and awarded Mayfield attorney's fees. Defendants appeal these decisions. We affirm.

I.

Tad Mayfield had worked as a nonpartisan legislative specialist in the assistant chief clerk's office of the Missouri House since 2013. At the time of his termination, Emily White was the assistant chief clerk of the House and Mayfield's direct supervisor. Dana Rademan Miller served as the chief clerk of the House and had previously been Mayfield's supervisor until 2018. During Mayfield's employment, he consistently received positive evaluations from his supervisors, with only one instance of corrective action.

---

[1] Two additional defendants were initially named in this lawsuit, but they have since been dismissed from the case.

[2] The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri.

In response to the COVID-19 pandemic, House legislative staff were placed on "administrative leave" to work from home beginning in March 2020. Mayfield preferred working from home to minimize his risk of exposure to COVID-19, for himself and his wife. In mid-May, administrative leave ended, but Mayfield continued to work from home at White's encouragement. When House legislative staff began preparing to return to in-person work, Mayfield created an alternative interim work plan that would allow him to continue working from home.

In July 2020, Missouri's governor called a special session of the legislature, which was to begin July 17. On July 28, White emailed Mayfield to revisit his interim work plan to include one day in the office per week. Mayfield proposed returning on August 14, although the date was never finalized. Around that time, Mayfield had also been expressing concerns to White, Miller, and the human resources director about "the safety of [the] work environment at the Capitol" and returning to "an environment where masks [were] not mandated."

On August 3, 2020, Mayfield sent an email to Elijah Haahr, the Speaker of the House, and Dave Schatz, the President Pro Tem of the Missouri Senate, titled "Capitol Safety." It read:

> I am writing to you because I feel an ethical and moral obligation to do so. We are living in unprecedented times that requires, likewise, unprecedented actions and decisions from the leadership and citizens of our state. Those actions and decisions, or lack thereof, will be recorded in history as either appropriate measures that helped save lives, or inappropriate and resulted in an increase in lives lost.

> Businesses, cities, and states across this great nation have heeded the CDC's warnings and implemented a number of measures designed to slow/stop the spread of COVID-19, including mandatory face coverings, if we are to continue in our efforts to reopen the economy and get people back to work. I am grateful the Missouri House of Representatives has implemented some of the same measures in an attempt to protect Members, staff, and visitors to our Capitol. Unfortunately, as of yet, the decision to require face coverings in the

chambers and public spaces in our Capitol has not been made, leaving all who enter our Capitol at greater risk of contracting COVID-19, and ultimately, negates any benefit received by the measures that have been implemented.

It is important to consider, Members from every district in this state are convening in our chambers and then returning to their respective communities to continue campaigning and holding fundraisers for their reelection bids, or assisting in the election of their successors. It compounds an already serious health crisis for Members to unknowingly contract or transmit COVID-19, due to the lack of a mask mandate in our Capitol, and then return home to unknowingly transmit it to their constituents. All this while hundreds if not thousands of new cases are reported in our state every day.

For the health and well-being of all who enter our Capitol, I am requesting that you, as leadership in the House and Senate, adhere to CDC guidelines and implement a mandatory face mask policy for all spaces within our Capitol, excluding the personal office spaces of Members.

With all due respect and for the safety of all Missourians,

Tad Mayfield
Legislative Specialist – Procedures
Assistant Chief Clerks Office
Missouri House of Representatives

Mayfield's August 3 email was forwarded to Miller, who then forwarded it to White. Three days later, on August 6, Miller and White met with Mayfield by telephone and fired him. Contending that his termination was retaliation for sending the August 3 email, Mayfield brought this 42 U.S.C. § 1983 suit alleging that Miller and White (collectively, Defendants) had violated his First Amendment rights.

Mayfield's lawsuit proceeded to a jury trial, where Defendants argued that the reason for his termination related to his job performance, not the August 3 email. Miller testified that she told Mayfield "he was being terminated for ongoing

performance issues" and because his supervisors had "lost confidence in his ability to do the job if he returned." Miller further testified that, throughout June and July, she and White discussed terminating Mayfield and that, "on or about" August 4, 2020, they made the decision to fire him.

Mayfield prevailed at trial. Defendants timely moved for judgment as a matter of law both before and after the jury returned its verdict. Fed. R. Civ. P. 50.[3] The district court denied both motions. The jury awarded Mayfield $15,000 in punitive damages—$10,000 against Miller, and $5,000 against White—and the parties stipulated that actual damages for lost wages amounted to $14,993.93. The district court also awarded Mayfield attorney's fees.

Defendants now appeal.

## II.

To prevail on his First Amendment retaliation claim, Mayfield had to show "that his conduct was constitutionally protected and that the protected conduct was a 'substantial' or 'motivating' factor in the defendant[s'] action which resulted in dismissal." Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (quoting Green v. St. Louis Hous. Auth., 911 F.2d 65, 70 (8th Cir. 1990)); see also

---

[3]Fed. R. Civ. P. 50(a) states:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
    (A) resolve the issue against the party; and
    (B) grant a motion for judgment as a matter of law . . . .

Fed. R. Civ. P. 50(a)(1). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . [n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law . . . ." Id. at 50(b).

Noon v. City of Platte Woods, 94 F.4th 759, 764 (8th Cir. 2024). Defendants argue that, despite the jury verdict, they were entitled to judgment as a matter of law. We review a district court's decision on a Rule 50 motion de novo, viewing the evidence in the light most favorable to the jury's verdict. Doe v. Bd. of Trustees of the Neb. State Colls., 78 F.4th 419, 423 (8th Cir. 2023) (citing Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004)). We review issues of law de novo. Grage v. N. States Power Co., 813 F.3d 1051, 1054 (8th Cir. 2015); see also Krekelberg v. City of Minneapolis, 991 F.3d 949, 953 (8th Cir. 2021).

A.

Defendants first contend that "Mayfield failed to establish that his August 3 email was constitutionally protected speech." To determine whether Mayfield's speech was entitled to First Amendment protection, we first "must 'determin[e] whether the employee spoke as a citizen on a matter of public concern.'" Henry v. Johnson, 950 F.3d 1005, 1011 (8th Cir. 2020) (alteration in original) (quoting Hemminghaus v. Missouri, 756 F.3d 1100, 1110 (8th Cir. 2014)). "If the answer is yes, then the possibility of a First Amendment claim arises." Id. (quoting Hemminghaus, 756 F.3d at 1111). "[O]nce the possibility of a First Amendment claim arises," the next question is "whether [Defendants have] produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations." Id. (third alteration in original) (quoting same). If "an adverse impact is found, the court engages in the Pickering balancing inquiry." Id. (quoting same); see also Pickering v. Bd. of Educ., 391 U.S. 563 (1968). But "[w]here there is no evidence of disruption, resort to the Pickering factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests." Henry, 950 F.3d at 1011 (quoting Hemminghaus, 756 F.3d at 1111).

i.

"So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their

employers to operate efficiently and effectively." Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006) (quoting Garcetti v. Ceballos, 547 U.S. 410, 419 (2006)). The issue here is whether, through his August 3 email, Mayfield spoke as a citizen on a matter of public concern. See Noon, 94 F.4th at 764; Connick v. Myers, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact.").

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane v. Franks, 573 U.S. 228, 241 (2014) (internal quotations omitted) (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." Henry, 950 F.3d at 1012 (quoting Connick, 461 U.S. at 147–48). The content, form, and context help discern whether an employee is "speak[ing] as 'a concerned citizen informing the public,'" or whether the employee is speaking on matters of personal concern. Id. (quoting Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1117 (8th Cir. 1997)); see also Bailey, 451 F.3d at 519.

We agree with the district court that Mayfield's speech in the August 3 email was a matter of public concern. First, the email's content focused on protecting the public from the COVID-19 pandemic. Mayfield wrote that he was advocating "[f]or the health and well-being of all who enter [the] Capitol" and requested that leadership "adhere to CDC guidelines and implement a mandatory face mask policy for all spaces within [the] Capitol, excluding the personal office spaces of Members." In the email, Mayfield did not express personal concerns, but rather addressed the welfare of communities across Missouri. Mayfield reasoned that without a masking requirement, "all who enter[ed] [the] Capitol [building were] at greater risk of contracting COVID-19." And he said that, with the special session, "Members from every district" would come to the Capitol, "unknowingly contract

or transmit COVID-19, due to the lack of a mask mandate in [the] Capitol, and then return home to unknowingly transmit it to their constituents."

The August 3 email was devoid of any mention of Mayfield personally. Although Mayfield noted capitol staff once, he mentioned them along with elected representatives and visitors, all of whom he thought were at risk of contracting COVID-19 by entering the building. Unlike his previous communications with White, Miller, and the human resources director, Mayfield did not express concerns specific to his or his family's health. Mayfield also did not request remote work accommodations. Rather, the email focused solely on public health and safety during what the Defendants have described on appeal as "the defining political issue of the time." In sum, the content in Mayfield's email squarely addressed a matter of public concern.

Defendants urge that the form and context of the August 3 email dictate otherwise. They point to Mayfield's other, more personal COVID-related communications—asking to stay at home, expressing disappointment that face masks were not being required at the capitol, and the like—to reject the public nature of the email at issue. Defendants argue that the email was merely a continuation of "the same, personal considerations" and "veneer for Mayfield's private desire to continue working at home." Defendants also argue that the form of Mayfield's speech—"an internal, nonpublic email" sent through his work account and during work hours—further shows his email was not a matter of public concern.

The August 3 email's form and context do not change the result here. See Henry, 950 F.3d at 1012; Connick, 461 U.S. at 147–48. Mayfield sent a formal email from his work address to his elected representatives, and he sent it in the context of the COVID-19 pandemic, at a time when many staff and elected representatives were planning to convene at the state capitol. The fact that Mayfield previously shared his private concerns about COVID-19 with his superiors and human resources representative does not change the nature of the August 3 email: a public employee's request for individual accommodation does not waive that employee's

right to later speak about a related "subject of general interest and of value and concern to the public." See Lane, 573 U.S. at 241 (internal quotations omitted). And Defendants cite no authority indicating such a limitation exists.

ii.

Because Mayfield's speech was on a matter of public concern, we then ask whether his public employer "has produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations." Henry, 950 F.3d at 1011 (alteration in original) (quotation omitted). "If there is evidence of disruption, an analysis under the so-called Pickering balancing test is necessary." Noon, 94 F.4th at 765 (citation omitted).

Defendants bear the burden of putting the Pickering balancing test into play by submitting evidence of disruption. See Sexton v. Martin, 210 F.3d 905, 911–12 (8th Cir. 2000) (observing that public employer bears the burden of offering evidence of adverse effect in order to put Pickering at issue). "Any underlying factual disputes concerning whether the plaintiff's speech is protected . . . should be submitted to the jury through special interrogatories or special verdict forms." Shands v. City of Kennett, 993 F.2d 1337, 1342 (8th Cir. 1993) (citations omitted). This is because "the jury should decide factual questions such as . . . whether the speech created disharmony in the work place." Id. (citations omitted). Here, Defendants failed to submit jury instructions on the Pickering issue. Without factual findings from the jury to support their assertion of disruption, Defendants cannot show that their interests as a public employer outweighed Mayfield's First Amendment rights. See Eighth Circuit Civil Jury Instrs. 13.91; Sexton, 210 F.3d at 910.

Attempting to avoid this conclusion, Defendants assert there is no factual dispute, stating it is "undisputed" that the email in question "would have a substantial negative impact on the House." But the record shows there was also testimony that Defendants did not consider the email at all when deciding to terminate Mayfield. A

jury could infer from that testimony that the email had no adverse impact on the operations of the House. See Noon, 94 F.4th at 765 ("To trigger the Pickering balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships.") (citation omitted); Sexton, 210 F.3d at 911–12 (observing that unsupported "conclusory statements" and "[m]ere allegations of disruption are insufficient to put the Pickering balance at issue" (citation omitted)). Given the factual dispute, the district court did not err in denying Defendants' motion for judgment as a matter of law on this basis.[4]

B.

Next, Defendants argue that Mayfield failed to establish that his protected activity was a motivating factor in his termination. They argue that no reasonable jury could conclude the Defendants' stated reasons for firing Mayfield were pretextual. See Noon, 94 F.4th at 764 (requiring public employee plaintiff bringing First Amendment retaliation claim prove *inter alia* that "the protected speech was a 'substantial or motivating factor' in [employers'] decision to take the adverse employment action" (citation omitted)). "Whether the protected conduct was a substantial or motivating factor in an employment decision is a question of fact, but the sufficiency of the evidence to create an issue of fact for the jury is solely a question of law." Morris, 512 F.3d at 1018 (citation omitted).

The evidence presented at trial showed that one day after Mayfield sent the August 3 email, Defendants decided to terminate him. And on August 6, Defendants

---

[4]Defendants' motion for summary judgment argued that Mayfield's First Amendment claim failed because his August 3 email was not constitutionally protected activity. The district court denied the motion, and the claim proceeded to trial. Defendants did not raise the argument that the August 3 email was disruptive to the work of the House until the morning of trial. The Pickering balancing is a question of law, see Shands, 993 F.2d at 1342, but as noted *supra*, the jury must decide any factual disputes underlying it.

fired Mayfield. Where—as here—temporal proximity between the protected conduct and the adverse employment action is "very close," that proximity can create a factual issue as to whether the protected activity was a substantial or motivating factor in the adverse action. See Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011). Defendants argue that the reason for Mayfield's termination was "poor performance." But the evidence adduced at trial showed that Mayfield consistently received good performance reviews: in his seven years employed at the House, he had to speak with Miller once about an incident with another employee, but he was never placed on any correction plans or probation. See Henry, 950 F.3d at 1014–15; see also Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014) (concluding favorable performance reviews militated toward finding pretext). Given this evidence, the issue was not "so one-sided" that the district court could have determined as a matter of law that the August 3 email was not a motivating factor in the decision to terminate Mayfield. See Steckstor by Santa Cruz v. Hancock, 984 F.2d 274, 276 (8th Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986)); Morris, 512 F.3d at 1018 (explaining that whether there is sufficient "evidence to create an issue of fact for the jury is solely a question of law").

We affirm the district court's denial of Defendants' motion for judgment as a matter of law on Mayfield's First Amendment claim.

III.

In the alternative, Defendants argue that they are entitled to qualified immunity. "A public official enjoys qualified immunity [] under 42 U.S.C. § 1983 unless a plaintiff shows that the official's [] conduct violated one of the plaintiff's clearly established constitutional rights." Rinne v. Camden Cnty., 65 F.4th 378, 383 (8th Cir. 2023) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Where a public official asserts they are entitled to qualified immunity, we undertake "a two-part inquiry to determine whether (1) a constitutional violation occurred, and (2) whether the right in question was clearly established at the time of the violation."

Henry, 950 F.3d at 1010–11 (citing Nord v. Walsh Cnty., 757 F.3d 734, 738 (8th Cir. 2014)). "[A]n official is entitled to qualified immunity unless both prongs are satisfied," and therefore "our analysis will end if either of the two is not met." Kulkay v. Roy, 847 F.3d 637, 642 (8th Cir. 2017) (citation omitted).

Because the district court did not err in denying Defendants' motion for judgment as a matter of law on Mayfield's First Amendment claim, the only question here is the second prong of the qualified immunity analysis. "A right is clearly established if 'a reasonable official would understand that what he is doing violates that right.'" Rinne, 65 F.4th at 384 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "Existing precedent need not be directly on point, but it must place the constitutionality of the official's conduct 'beyond debate.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" Id. at 384–85 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)).

Defendants assert that the district court erred by "defin[ing] the relevant right at an impermissibly broad level." But the Supreme Court has held that "[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383 (1987) (citation omitted);[5] see also Rinne, 65 F.4th at 384 ("It was clearly established at the time of the [state commission's] action that a government official may not retaliate against a citizen for the exercise of his First Amendment rights." (citation omitted)). A public employee's First Amendment right to speak on a matter of public concern was clearly established in August 2020.

---

[5]Defendants assert we should ignore Rankin because it is "distinguishable by subsequent developments from the Supreme Court and this Court," yet they fail to explain how this is so, and we have repeatedly reaffirmed the case's proposition. See, e.g., Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." (quoting Rankin, 483 U.S. at 383)); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1080–81 (8th Cir. 2008) (quoting same); Noon, 94 F.4th at 766 (quoting same).

In response, Defendants argue that for a right to be clearly established, a plaintiff must cite cases where the speech was on the same topic (here, public health and safety), and the speech must have been made by a particular kind of employee (nonpartisan), within a particular type of government body (deliberative), and to a particular colleague (partisan leadership). But we do not require such "a case directly on point." al-Kidd, 563 U.S. at 741; see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" (second alteration in original) (quoting Creighton, 483 U.S. at 640)). Defendants had fair notice that terminating Mayfield for criticizing the decisions of public officials violated the First Amendment. See Noon, 94 F.4th at 766–67 (recognizing that we have held "no right is more clearly established than freedom of speech" and "straightforward criticism" of public officials' actions is protected under the First Amendment (citations omitted)).

Because Mayfield had a First Amendment right to speak on a matter of public concern as a public employee, and that right was clearly established in August 2020, we affirm the district court's denial of qualified immunity.

IV.

Defendants argue next that the district court erred in submitting a punitive damages instruction. When a defendant asserts there was insufficient evidence to submit the issue of punitive damages to the jury, "[w]e review de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the verdict." United States v. Rupp, 68 F.4th 1075, 1079–80 (8th Cir. 2023) (citations omitted).

In a § 1983 case, "punitive damages are available upon proper proof[,]" but they "are never awarded as of right[.]" Thurairajah v. City of Fort Smith, 3 F.4th

1017, 1026 (8th Cir. 2021) (citations omitted). "Instead, 'punitive damages are awarded or rejected in a particular case at the discretion of the fact finder once sufficiently serious misconduct by the defendant is shown.'" Id. (quoting Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir. 1997)). "The focus, in determining the propriety of punitive damages, is on the intent of the defendant, and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." Id. (quoting same). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. (alteration in original) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). "'Evil motive' or 'reckless indifference' pertains to whether a defendant knows he 'may be acting in violation of federal law,' not his awareness that he is 'engaging in discrimination.'" Rupp, 68 F.4th at 1080 (quoting Badami v. Flood, 214 F.3d 994, 997 (8th Cir. 2000)). "To be liable for punitive damages, 'it is sufficient that a defendant discriminate in the face of a perceived risk that his actions will violate federal law.'" Id. (quoting Quigley v. Winter, 598 F.3d 938, 953 (8th Cir. 2010)).

At trial, Miller testified that, based on her workplace training, she knew "it could be illegal to terminate an employee who voices concerns about public health and safety." Defendants acknowledge this testimony but assert Miller did not know her actions would violate *federal* law. However, Miller's acknowledgement that her conduct could be illegal came immediately after she was questioned about the federal Constitution and Bill of Rights. Miller confirmed that she knew, "based on [her] 19 years of employment at the House" and "training that [she had] received as a state supervisor," it was illegal to fire someone who raised health and safety concerns. Similarly, in White's deposition, which was played to the jury at trial, she explained that she was Miller's assistant, had been employed by the House for approximately 13 years, and had served as Mayfield's supervisor since 2018.

Viewing these facts in the light most favorable to the verdict, Rupp, 68 F.4th at 1079–80, and "drawing all reasonable inferences in favor of the nonmoving

-14-

party," Salitros v. Chrysler Corp., 306 F.3d 562, 568–69 (8th Cir. 2002) (citation omitted), there was sufficient evidence to create a jury question as to whether Miller acted with, at minimum, "reckless indifference" to the fact that her conduct could violate federal law. It is also reasonable to infer that White—a state supervisor who had been in her role for a number of years, had been employed by the House for more than a decade, and served as Miller's assistant—had similar training and knowledge as Miller. Thus, a reasonable jury could find that White, like Miller, was aware it could be illegal to fire an employee who voiced concerns about public health and safety. See Rupp, 68 F.4th at 1080 (relying on defendant's "years of experience" in the position and significant knowledge of related law to conclude the district court did not err in submitting punitive damages to jury because "evidence was sufficient to support the conclusion that [the defendant], at the very least, acted recklessly and discriminated against the [plaintiffs] 'in the face of a perceived risk' that his actions would 'violate federal law'" (quoting Quigley, 598 F.3d at 953)).

Given Defendants' presumed knowledge about the law, in conjunction with the facts underlying the retaliation claim itself, sufficient evidence supported the district court's decision to send the question of punitive damages to the jury for both Miller and White. Cf. King v. Zamiara, 788 F.3d 207, 216 (6th Cir. 2015) ("When a defendant retaliates against a plaintiff's exercise of his First Amendment rights, the defendant necessarily acts with the purpose of infringing upon the plaintiff's federally protected rights."); Powell v. Alexander, 391 F.3d 1, 19 (1st Cir. 2004) ("The legal standard for a finding of liability for retaliation (the underlying liability claim in a case such as this) already entails an inquiry into a defendant's motive as well as into the legally protected nature of the plaintiff's conduct.").

V.

Finally, Defendants argue that the district court improperly awarded excessive attorney's fees to Mayfield. "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" Farrar v. Hobby, 506 U.S. 103, 114 (1992) (quoting Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)).

At the same time, "[t]here is no precise rule or formula for making [attorney's fees] determinations." Wal-Mart Stores, Inc. v. Barton, 223 F.3d 770, 773 (8th Cir. 2000) (first alteration in original) (quoting Arneson v. Callahan, 128 F.3d 1243, 1249 (8th Cir. 1997)). Moreover, "damages awards do not reflect fully the public benefit advanced by civil rights litigation, [and] Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." Id. (quoting City of Riverside v. Rivera, 477 U.S. 561, 574 (1986)). We "review for abuse of discretion the actual award of attorney's fees and costs." Ludlow v. BNSF Ry. Co., 788 F.3d 794, 803 (8th Cir. 2015) (quoting Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1036 (8th Cir. 2008)).

Defendants argue that "[t]he district court erred by failing to reduce the attorney's fees awarded given the significant gap between the amounts Mayfield sought at trial and the actual jury verdict and judgment." Defendants compare the amounts claimed in Mayfield's Rule 26(a) disclosures, as well as his pretrial settlement offer, to the substantially lower final damages award. But contrary to Defendants' assertion otherwise, the district court did "account for any discrepancy between the amount Plaintiff originally sought and the amount actually realized following trial" when it adjusted downward the hourly rate for the attorney's fees. Under the circumstances, we discern no abuse of discretion.

VI.

We affirm.

_____